***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Chapman along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms, with some modification, the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the N.C. Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and named employer.
3. New Hanover County Board of Education was self-insured with North Carolina School Board Insurance Trust as the Servicing Agent.
4. On May 6, 1998 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer.
5. In addition, the parties stipulated into evidence a Release dated November 3, 1998.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff, who was forty-one years old at the time of the hearing before the Deputy Commissioner, was a school bus driver for defendant in 1998 and worked with exceptional children. She had worked as a bus driver for the county from 1976 to 1982 and again beginning in 1992. Her assigned bus route in 1998 involved students with behavioral problems and not physically handicapped students, so she drove a regular school bus.
2. On May 6, 1998 plaintiff was involved in an accident while driving her bus. A car approaching Wrightsville Avenue from a side road failed to stop for a red light and pulled out in front of her as she was driving down Wrightsville Avenue. She slammed on the brakes and veered to the left, but the bus collided with the car. At the time of impact, plaintiff was thrown backwards in her seat. As a result of the accident, she developed neck and upper back pain, pain in her left shoulder and later a headache at the back of her head just above her neck. Following the accident, she went to Dr. Graybar, a chiropractor, for treatment. He administered chiropractic treatment until June 22, 1998. Plaintiff remained symptomatic throughout that time, with fluctuating symptoms, and the chiropractor did not release her from his care. However, she did not return for further treatment after June 22, 1998.
3. By the time plaintiff last saw Dr. Graybar, the school year was over and she was no longer working. She continued to experience headaches, a sensation of tension in her upper back and occasional burning pain down her left arm which would come and go, but she thought that her condition was sufficiently improved that she could stop seeing the doctor.
4. When the next school year started August, plaintiff was assigned to a modified bus designed for physically handicapped students. She and a partner drove two routes that involved a total of nine students in wheelchairs. One of the bus drivers drove while the other operated the door and wheel chair lift, and secured the wheelchairs to the floor. It was a physically demanding job when not actually driving the bus. Closing the door was quite difficult; bending and kneeling was required in order to secure the wheelchairs to the bus floor; and whoever was not driving tended to get "thrown around" while underway. Plaintiff continued to have the tension or pressure feeling along her upper back and into her left shoulder along with occasional headaches and pain into her left arm. The headaches were different from the migraines that she had previously experienced. Her migraines affected the front of her head at the temples and forehead. The headaches following her accident remained at the base of her of head above her neck.
5. Plaintiff continued working throughout the 1998 to 1999 school year and resumed working on a wheelchair bus in August 1999. Her symptoms slowly worsened so that she began to have pain down her arm more frequently and while sleeping. She assumed that her problems were from having to handle wheelchairs. The headaches became worse and more frequent, as well. Since she had a family history of aneurysms, she went to the emergency room in December 1999 when she was having a particularly severe headache. A CT scan was ordered which apparently was negative. The emergency room physician recommended that she see a neurosurgeon and referred her to Dr. Wilfong.
6. Dr. Wilfong examined plaintiff on January 26, 2000. Plaintiff described her symptoms, including the pain going down her left arm. After examining her, it was Dr. Wilfong's impression that she had a problem in her neck, so he ordered an MRI. There was some delay in getting the test performed, but the films were provided to the doctor approximately a month later. The test revealed a central ruptured disc at C3-4 that was migrating upwards towards the head. There was sufficient pressure on the spinal cord from the disc that Dr. Wilfong was concerned that plaintiff was at risk for paralysis, so he recommended surgery to decompress and fuse the affected interspace. He performed the operation on April 24, 2000. Plaintiff developed a Horner's syndrome as a complication of surgery but otherwise improved. Dr. Wilfong sent her to Dr. Graybar for some therapy and followed her recovery. By September 4, 2001 the Horner's syndrome had cleared but plaintiff was still having some shoulder pain. Due to the persistent symptoms, Dr. Wilfong ordered an MRI to rule out a recurrent disc. Although the test revealed some bulging discs, there was no evidence of impingement on any nerves. Consequently, he recommended only further conservative treatment.
7. Plaintiff stayed out of work after her surgery through the remainder of that school year but returned to work in August 2000 as scheduled. She continues to work as a bus driver.
8. Defendants paid plaintiff's medical expenses following the bus accident until she stopped seeing Dr. Graybar, but they did not submit a Form 60 or other written admission of liability with the Industrial Commission because plaintiff did not provide medical authorization for more than one week's absence. A Form 28 return to work report was submitted to the Commission as was a Form 28B showing the total medical compensation paid. Plaintiff sought counsel to pursue a third party action against the other driver involved and that claim was settled in November 1998. Although an order of distribution was never filed by the Industrial Commission, which was unaware of the settlement, defendants were reimbursed for medical expenses paid.
9. When plaintiff first saw Dr. Wilfong in January 2000, plaintiff thought that she might have an aneurysm. She was not aware of a cervical spine problem until Dr. Wilfong told her his diagnosis. It was only then that she described the accident that she had sustained in May 1998. Her testimony has been found to be credible.
10. The cervical spine condition for which plaintiff was treated beginning in December 1999 was a proximate result of the accident of May 6, 1998.
11. As a result of the May 6, 1998 injury by accident, plaintiff was unable to work from May 7 through May 11, 1998, when excused by Dr. Graybar. She did not prove further disability until she stopped working to have surgery on April 24, 2000. Following the operation, she was kept out of work through July 4, 2000 by Dr. Wilfong and Dr. Graybar. There was no further medical authorization for disability after that date. Plaintiff did not usually work during the summer months when school was out of session so she did not attempt to return to work until called back by the school system. Consequently, plaintiff proved that she was unable to work from April 24 through July 4, 2000 due to her injury.
12. Although Dr. Wilfong gave plaintiff a permanent partial disability rating in his testimony, he did not indicate that she had reached maximum medical improvement. Rather, he was considering other options for treatment in order to relieve her ongoing symptoms. Consequently, no finding is made regarding permanent partial disability in that plaintiff has apparently not reached the end of the healing period.
13. Defendant filed a Form 28B on 22 September 1998 showing that the last medical compensation paid was on August 7, 1998. Plaintiff filed a Form 18 in May 2000. Plaintiff's claim was filed with the Commission within two years after the last payment of medical compensation.
14. The evidence did not establish plaintiff's average weekly wage.
15. This claim was defended with reasonable grounds.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's claim was filed with the Commission within two years after the last payment of medical compensation. Therefore, plaintiff's claim is not time-barred and the Commission has jurisdiction. G.S. §97-24(a)(ii).
2. On May 6, 1998 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. G.S. § 97-2(6).
3. The cervical spine condition for which plaintiff was treated beginning in December 1999 was a proximate result of this injury by accident. Click v. Pilot Freight Carriers, Inc., 300 N.C. 164
(1980).
4. Plaintiff is entitled to compensation for temporary total disability for eleven weeks for the periods from May 7 though 11, 1998 and from April 24 though July 4, 2000. G.S. § 97-29.
5. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. G.S. §§ 97-2(19);97-25.
6. Plaintiff is not entitled to have attorney's fees assessed against defendant in that the claim was defended with reasonable grounds. G.S. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff for eleven weeks for her temporary total disability. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
3. An attorney's fee in the amount of twenty-five percent of the compensation awarded is hereby approved for plaintiff's counsel, which fee shall be deducted from the aforesaid award and paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER